UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Ford Motor Company,

       Plaintiff,

v.

Ghreiwati Auto, et al.,

       Defendants.

_____/

Case No. 12-14313

Honorable Nancy G. Edmunds

## <u>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART FORD'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS [14]</u>

At this case's core is two dealership contract disputes between Plaintiff Ford Motor Company and two dealership defendants: Defendant Ghreiwati Auto (Auto) and Defendant Orient Development General Trading Co., L.L.C. (Orient). The Auto and Orient contracts are almost identical and there are overlapping owners between the two defendants.

On September 9, 2012, Ford filed suit against Auto and Orient seeking (1) to enjoin arbitration proceedings it alleges are subject to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., but for which 15 U.S.C. § 1226 only allows the arbitration to take place when both parties to the manufacturer-dealer contract consent, and Ford has withheld its consent, (2) a declaratory judgment that Ford has no obligation to arbitrate the controversies between itself and Auto and itself and Orient, and (3) to enjoin Auto and Orient from their alleged "continued and unauthorized use of Ford's trademarks[.] (Dkt. 1, Comp. ¶ 9.)

On November 15, 2012, Defendants filed their answer with affirmative defenses and counterclaims. (Dkt. 5.) Defendants each have five claims against Ford: (1) breach of contract, the Global Importer Dealer Sales and Service Agreement (GIDSSA), that

Defendants each entered into with Ford, (2) violation of the Michigan Dealer Act, Michigan Compiled Laws § 445.1561 et seq., (3) taking of trade secrets, taking corporate opportunity and breach of fiduciary duty of loyalty, (4) unjust enrichment, and (5) promissory estoppel. (Dkt. 5, Countercl.)

Before the Court is Ford's motion to dismiss Counts III through X of Auto and Orient's counterclaims, all of the claims except for the breach of contract claims. (Dkt. 14, Pl.'s Mot. to Dismiss.)

For the reasons explained below, the Court GRANTS Ford's motion to dismiss with respect to the Michigan Dealer Act, breach of fiduciary duty, and taking of trade secrets and corporate opportunity claims; the Court DENIES Ford's motion to dismiss with respect to the unjust enrichment and promissory estoppel claims.

## I.   Facts

### A. Auto and Orient's relationships with Ford

Auto is a Syrian corporation with its principal place of business in Damascus, Syria. (Countercl. ¶ 4.)   Auto is owned by five individuals: Imad Ghreiwati (24.5%); Issam Ghreiwaiti (24.5%); Bashar Ghreiwati (24.5%); Muhammed Ghreiwati (24.5%) (the "Ghreiwatis"); and Sabrieh Sammane (2%). (*Id.* ¶ 7.)

Orient is an Iraqi limited liability company with its principal place of business in Baghdad, Iraq. (Countercl. ¶ 5.)

In October, 2003, Auto and Ford entered into the Auto GIDSSA. (Countercl. ¶ 4.) The Ghreiwatis entered into the Auto GIDSSA as Lebanese citizens, using their Lebanese

passports.[1]  (*Id.* ¶ 8.)  They resided in Syria, though, for eight years, while they did business as Auto with Ford.  (*Id.*)

Auto states that it performed "extremely well for Ford in Syria" for approximately eight years.  (Countercl. ¶ 10.)  During that time, Auto alleges that it sold a high volume of  Ford vehicles throughout Syria and often sold the vehicles to third party traders who resold the vehicles to the public.  (*Id.* ¶ 12.)  Auto states that Ford never complained to Auto that Auto was selling "in or from unauthorized locations, marketing in or from unauthorized locations, selling to third party traders, storing Ford products in unauthorized locations or misusing Ford's trademarks[.]" (*Id.* ¶¶ 12-13.)  Auto says that it "was encouraged to sell as many Ford vehicles as possible wherever it could throughout Syria based on the ancient Middle East practice of using third party traders."  (*Id.* ¶ 13.)

Auto alleges that the use of third party traders "is the way business has been conducted in the Middle East for hundreds of years and it does not conflict with the language of the GIDSSA."  (Countercl. ¶ 14.)  Auto states that the GIDSSA does not prohibit against third party trader usage and that this usage was "approved based on the partie[s'] course of performance."  (*Id.*)

Auto also alleges that it and Ford were "highly rewarded" for Auto's sales, marketing, promotion, and storage practices throughout Syria.  (Countercl. ¶ 15.)  Auto maintains that Ford agreed to Auto's sales, marketing, promotion, and storage practices based on the parties' course of performance for eight years.  (*Id.*)

---

[1]Auto states that Imad, Issam, and Muhammad Ghreiwati are American citizens as well as Lebanese citizens.  (Countercl. ¶ 8.)  No mention is made as to Sabrieh Sammane's citizenship.

3

During the eight-year business relationship, Auto states that Ford visited its principal place of business and was "well[-]aware of Auto's sales and marketing practices which not only include[d] sales to third party traders, but also successful penetration of a market that was divided by religious regions. (Countercl. ¶ 18.)

Given the success of the relationship, Auto alleges that Ford approached Auto's owners about opening a dealership in Iraq.  (Countercl. ¶ 17.) Auto maintains that Ford knew that Auto's owners could study the market in Iraq and "accurately analyze projected sales information which Ford was otherwise unable to obtain in Iraq."  (*Id.*)  Auto states that, at the time of the discussions with Ford, Ford had established three selling regions in Iraq, because Iraq was divided into thirds by religions: the Kurds in the north, the Shias in the south and west, and the Sunnis in central and west.  (*Id.*)  Auto states that NIVA, a dealership in northern Iraq, had been a Ford importer-dealer in northern Iraq and had never been "willing or capable of achieving a high volume of sales throughout the Iraq market." (*Id.* ¶ 19.)

Orient states that, after much discussion, Ford offered it the GIDSSA for Iraq "with the promise of a long[-]term manufacturer-dealer relationship[.]" (Countercl. ¶ 20.)  Orient suggests that Ford was using Orient to "test the Iraq market to determine if one dealer could successfully penetrate a market divided by religious differences as Auto had done in Syria."  (*Id.*)  Orient states that Ford was "unsure how its products could best be marketed in Iraq" since NIVA "had been unable to make sales throughout the country." (*Id.*)

Orient states that Ford then required a separate and distinct entity from Auto–a distinct corporate entity in Iraq, with Iraqi ownership and management–and a business plan

4

for Iraq before Ford would award a letter of understanding ("LOU") or the GIDSSA for Iraq. (Countercl. ¶ 21.)  Orient states that it formed itself as an independent Iraqi corporation with the ownership consisting of: Falah Hassan Omar Al Rawi (26%); Omar Hasan Omar Al Rawi (25%); Imad Ghreiwati (13%); Issam Ghreiwati (12%); Bashar Ghreiwati (12%); and Muhammad Ghreiwati (12%).  (*Id.* ¶ 23.)

After the formation, Orient states that it prepared a business and operating plan for Iraq, submitted it to Ford, and received Ford's approval.  (Countercl. ¶ 24.)  Orient states that its business plan "was prepared based on some of Orient's owner[s'] past experience in marketing Ford products in Syria."  (*Id.*)  Orient states that it anticipated and relied upon the reasonable expectation that the Iraq GIDSSA "would be interpreted consistent with the established course of performance existing between Auto and Ford in Syria."  (*Id.*)  Orient explains that the sales projections in the business plan "were based on the mutually agreed upon practices of Auto in Syria."  (*Id.*)

Ford accepted Orient's business plan and awarded the LOU on November 12, 2009. (Countercl. ¶ 25.)  Orient states that the business plan forecasted sales of 4,000 vehicles. (*Id.*)  Orient alleges that, by accepting the business plan, Ford "confirmed its agreement to do business in Iraq applying the same interpretations to its contract with Orient that Ford had applied with Auto in Syria."  (*Id.*)  Orient states, "[s]pecifically by accepting Orient's business plan Ford agreed that Orient could sell to third party traders who could then resell Ford products to the public."  (*Id.*)  Orient asserts that "[this acceptance] is clear just through business practice and simple common sense."  (*Id.*)  Orient adds that neither it nor Ford "expected Orient could store, much less sell, thousands of vehicles from a location that was so dangerous that even Ford employees could not visit."  (*Id.*)

5

Once Ford awarded Orient the LOU, Orient states that it purchased land, built a facility in the war zone of Baghdad, hired security, trained personnel and had to find a safe and secure site to store new Ford products that was located outside Baghdad. (Countercl. ¶ 29.) Orient states it spent millions of dollars in order to comply with the LOU. (*Id.*)

Orient again suggests that Ford agreed to market the vehicles in the same way as Ford marketed in Syria because Orient entered into a contract with the Dajleh and Euphrates Bank for Development and Investment. (Countercl. ¶ 30.) Those contracts permitted, Orient maintains, Orient to "sell vehicles to the public from any and all of the bank's locations throughout Iraq." (*Id.*) Orient adds that the bank has branches all over Iraq. (*Id.*) Orient also offers the fact that neither party "believed" that Orient could sell 4,000 vehicles in the first year when Orient was located in the "Green Zone" of Baghdad, the "most heavily protected area in" Baghdad. (*Id.* ¶ 31.) Orient states that Ford knew or should have known that selling 4,000 vehicles in the restricted locality would be impossible and impracticable. (*Id.*)

Orient maintains that further evidence that Ford and Orient agreed to the same course of performance as in Syria exists in the fact that Ford "requested and required Orient to inspect and replace defective tires on Ford recall vehicles for government[-]owned Ford vehicles." (Countercl. ¶ 32.) Orient states that it inspected and replaced (when necessary) tires on approximately 8,000 vehicles for the Ministry of Interior alone (*Id.*) Orient adds that it conducted the inspections and replacements throughout Iraq. (*Id.*)

Orient states that, in 2010, before Ford awarded the GIDSSA, Orient paid for and received hundreds of new Ford vehicles to sell in Iraq. (Countercl. ¶ 33.) Orient states that

6

it purchased those vehicles "[i]n an effort to assist Ford with Ford's excess product[.]" (*Id.* ¶ 34.)

In March, 2011, Orient and Ford entered into the Orient GIDSSA.  (Countercl. ¶ 5.)

Less than three months after the GIDSSA with Orient, Orient states that Ford began "to renegotiate the agreement by threatening to terminate Orient's GIDSSA for marketing Ford products throughout the country of Iraq as the parties had agreed."  (Countercl. ¶ 36.)

Orient alleges that its actions and the money it spent to comply with Ford's LOU put it at a severe bargaining disadvantage.  (Countercl. ¶¶ 36, 37.)

In June, 2011, Orient states that Ford sent it a letter alleging that Orient was selling vehicles from unauthorized locations and gave Orient sixty days to resolve the issue. (Countercl. ¶ 38, Ex. I.)  In the June 17, 2011 letter, Ford states that the Orient GIDSSA limited Orient's sale of Ford vehicles solely to the Western Iraq Market Area.  (*Id.*)  Ford stated that it had discovered "again" that third party traders were selling Ford vehicles in the northern Iraq operating area, which contractually belonged to NIVA.  (*Id.*) Ford indicated that the third party trader selling of vehicles violated the GIDSSA.  (*Id.*)  Ford stated that it was giving Orient sixty days "to be in full and permanent compliance with the GIDSSA[.]" (*Id.*)  Ford demanded that Orient "immediately and permanently discontinu[e] sales to non-Ford authorized [third] parties," among other demands.  (*Id.*)  Ford threatened that failure to meet the sixty-day time frame or failure to "provide acceptable solutions" would result in Ford "taking measures available to [it] under the terms of the GIDSSA up to and including termination."  (*Id.*)

After Orient received the letter, Orient states that it asked Ford how it should respond to the letter.  (Countercl.  ¶ 39.)  Orient alleges that Ford told it not to provide a written

7

response, but to provide a new business plan that the parties would discuss at a meeting in July. (*Id.*) Orient maintains that Ford requested Orient to research the Iraq market and prepare another business plan for 2012 to 2014 "reflecting two different scenarios to be presented" at a meeting in Lebanon, in July: (1) a marketing plan projecting sales performance as if it were the only Ford dealer in Iraq, and (2) a marketing plan projecting sales as if there were two dealers selling all over the entire country (each having free reign to open locations anywhere in the country). (*Id.* ¶ 40.)

Orient states that it "attempted to comply with Ford's newly contrived term and demand" and therefore "repurchased every vehicle it could find that a third party trader had taken to sell in northern Iraq." (Countercl. ¶ 43.)

Orient alleges that Ford scheduled a meeting in Lebanon, to be held on July 27, 2011, to review the business plans. (Countercl. ¶ 44.) Orient states NIVA was scheduled to meet Ford the day before. (*Id.*)   Orient adds that Ford required both Orient and NIVA to sign confidentiality agreements. (*Id.* ¶ 45.)

After the June 17, 2011 letter and before the July 27, 2011 meeting, Orient states that Ford sent it a letter congratulating Orient for another "amazing sales performance." (Countercl. ¶ 46, Ex. K.) Orient points out that, in the July 13, 2011, Ford did not "complain about where Orient sales [were] taking place, how Orient [was] marketing Ford vehicles, how Orient [was] using Ford's trademark[,] or where Orient [was] storing vehicles." (*Id.* ¶ 47.)

Orient states that the July 27, 2011 meeting took place and that it submitted its business plans to Ford and Ford stated that it would get back to Orient within two months regarding which plan it chose, NIVA or Orient's. (Countercl. ¶ 50.)

8

### B. Ford terminates the GIDSSAs

Auto states that it did business with Ford until Ford terminated the contract on August 18, 2011.  (Countercl. ¶ 4)

On August 22, 2011, Ford sent Auto a letter confirming a phone call on August 18, 2011 in which Ford told Auto that President Obama's Executive Order on August 18 "prohibits the exportation, reexportation, sale or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Syria."[2] (Countercl., Ex. B.)  In the letter, Ford told Auto to comply with the GIDSSA's Paragraph 15, "regarding [] Auto's obligations upon termination, including but not limited to discontinuing use of Ford trademarks and trade names."  (*Id.*)

Orient states that it did business with Ford under the Orient GIDSSA for less than six months.  (Countercl. ¶ 5.)  Orient explains that Ford also terminated the Orient GIDSSA on August 18, 2011.  (*Id.*)

On September 8, 2011, Ford sent Orient a notice of termination letter.  (Countercl., Ex. D.)  Ford stated that it was basing its termination off of the GIDSSA's Paragraph 13(b)(1), (b)(4), and (b)(5) as well as discharge under Michigan law.  (*Id.*)  Ford explained

---

[2]Exec. Order No 12,582, 76 Fed. Reg. 52209 (Aug. 17, 2011).

The Executive Order prohibited "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Syria[.]"  Exec. Order No 12,582, 76 Fed. Reg. 52209 (Aug. 17, 2011).

"Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited."  *Id.*

9

that Paragraph 13(b)(1) requires Orient to receive prior written consent whenever Orient changes its ownership.  (*Id.*)  Ford wrote:

> On September 4, 2011, Ford received notice from [Orient] that Mr. Imad Ghrewiwati's shares as Chairman of [Orient] had been retired and sold to his three brothers Issam, Bashar and Mohammad equally and that a revised contract reflecting the change in ownership would be sent to Ford. Not only did [Orient] not seek the required prior consent for his ownership/operational charge - which itself is a material breach and violation of the GIDSSA - but based on Ford's current information and understanding of the structure of the business and selling and acquiring owners, Ford would not have been able to consent even if asked because the transaction, as proposed and apparently consummated, might be deemed to violate the Executive Order issued by President Obama on August 18, 2011[.]

(*Id.*)  Ford explained that "[b]y virtue of the EO, ordinary and customary business dealings and operations under the current ownership, management and structure of [Orient] adversely affect the good name, goodwill or reputation of Ford, its affiliates and products." *Id.*  That adverse effect, Ford stated, gave Ford the right to terminate the GIDSSA under Paragraph 13(b)(4).  (*Id.*)

Ford also listed another basis for termination.  (Countercl., Ex. D.)  Ford stated that, on June 17, 2009, it sent Orient a written notice that Orient had violated the GIDSSA "for permitting the display and sales of new vehicles outside its operating area of Baghdad after having received multiple assurances from [Orient] that this [action] was not happening. (*Id.*)  Ford wrote that the letter gave Orient sixty days to resolve the alleged violation or "risk action by Ford up to and including termination." (*Id.*)  Ford stated that, despite Orient's assurances, Orient continued to violate the GIDSSA, and Ford therefore was terminating the GIDSSA on that basis as well.  (*Id.*)

Ford addressed the EO in the letter too.  (Countercl., Ex. D.)  Ford stated that, pursuant to the EO and Michigan law, Ford was discharging the GIDSSA because it

10

believed that Orient's ownership, structure, residence, and operations were dependent "in large part on persons working and living in Syria[.]" (*Id.*)

Ford concluded by informing Orient to comply with the GIDSSA's Paragraph 15, listing Orient's obligations upon termination of the GIDSSA.  (Countercl., Ex. D.)

Defendants argue that Ford's reasons for terminating the GIDSSAs are pretext. Defendants state that Ford's objection to the transfer of ownership (Imad Ghreiwati's retiring of stock, resulting in a 13% stock transfer to the other owners) is not objectionable by the GIDSSA's terms.  (Countercl. ¶ 64.)  Defendants also argue that Ford could not, citing the EO, argue that Orient had violated the EO because it was not doing business in or transacting business having an effect on or in Syria.  (*Id.* ¶ 65.)  Defendants finally argue that Ford's third reason for terminating the Orient GIDSSA, for Orient operating outside of the GIDSSA-provided locality, was inappropriate because the parties' course of performance established that using third party traders was permitted.  (*Id.* ¶ 66.)

Relating to Auto, Defendants argue that Ford has also improperly cited the EO as a basis for termination. Defendants argue that, in 2004, President Bush had imposed sanctions against Syria, prohibiting exports to Syria, but that Ford still, for eight years, exported vehicles to Syria. (Countercl. ¶¶ 74-77.)  Auto states that Ford wrongfully breached the Auto GIDSSA solely on the basis of the 2011 EO.  (*Id.* ¶ 85.)

After receiving the termination notices, Auto and Orient both allege that they requested a meeting with Ford, in accordance with GIDSSA Paragraph 14(a).  (Countercl. ¶¶ 92, 93.)  Defendants state that Ford forced them to hire attorneys just so that Ford would meet with them, as provided for in Paragraph 14(a).  (*Id.* ¶ 94.)  After Defendants' attorneys demanded a settlement meeting, Defendants state that Ford begrudgingly agreed, but then

11

failed to make even a "nominal offer" and "left the meetings stating it would not pay Auto or Orient 'a dime.'" (*Id.* ¶ 98.)

After the meetings, Defendants state that the GIDSSAs provided that any disputes relating to the contracts would be resolved through arbitration.   (Countercl. ¶ 99.) Defendants allege that Ford unilaterally chose unconscionable arbitration terms and then breached the terms when it preemptively filed a complaint in this Court.

On September 27, 2012, Ford filed a complaint seeking to enjoin arbitration proceedings.  (Dkt. 1.)

On November 15, 2012, Defendants filed their answer with their counterclaims of breach of contract, breach of the Michigan Dealer Act, breach of fiduciary duty, unjust enrichment, and promissory estoppel. (Dkt. 5.)

On February 11, 2012, Ford moved to dismiss all the counterclaims except the breach of contract claims.  (Dkt. 22.)

## II.   Rule 12(b)(6) standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  In a light most favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief.  *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996).  To survive a Rule 12(b)(6) motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis

omitted).  *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

"[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 679 (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.*

> Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

*Id.* (internal quotation marks and citation omitted).  Thus:

> A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.*  In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Id.* at 678 (internal quotation marks and citation omitted).

## III.   Analysis

Because Ford has filed a motion to dismiss, and the Court must accept all well-pleaded allegations as true, the Court finds that Auto and Orient's unjust enrichment and promissory estoppel claims may survive. But because no cause of action exists under the Michigan Dealer Act for out-of-state dealerships, Auto and Orient cannot sustain a cause of action under that theory. The Court further finds that Auto and Orient have not pleaded sufficient facts of breach of fiduciary duty and taking of trade secrets or corporate opportunities claims. The Court dismisses those claims as well. The Court therefore grants in part and denies in part Ford's motion to dismiss.

## A. The Michigan Dealer Act does not apply to entities not physically located in Michigan

Auto and Orient allege that Ford violated various provisions of the Michigan Dealer Act. (Countercl. ¶¶ 126, 133.) They allege that Ford breached the MDA by: failing to act in good faith; wrongfully cancelling/terminating/or failing to renew the GIDSSA; failing to give the required notices of termination, cancellation, or non-renewal of the contract; failing to compensate for termination of the GIDSSA; and failing to compensate for other expenses incurred by the breach. (*Id.*)

Ford argues that Defendants cannot assert MDA claims. (Ford's Mot. to Dismiss at 8-9.) Ford suggests that the MDA only applies to dealerships located in Michigan. (*Id.* at 9.) Ford is correct.

The MDA "governs the relationship between the manufacturers and dealers of new motor vehicles." *Bright Power Sports, LLC v. BRP U.S. Inc.*, 09-11545, 2009 WL 4250698, at *1 (E.D.Mich. Nov. 25, 2009) (Cohn, J.). But the MDA has "no application to dealers located outside the state of Michigan," "[n]otwithstanding the terms, provisions, or

14

conditions of a dealer agreement[.]" Mich.Comp.Laws §445.1582.  MDA § 20, an action for damages, applies only to a "new motor vehicle dealer."  Mich.Comp.Laws § 445.1580.  To qualify as a "new motor vehicle dealer," the MDA requires that the dealer have "an established place of business in [Michigan.]" Mich.Comp.Laws § 445.1565, s. 5 (2).[3]

Ford maintains that Auto and Orient are undisputedly not located in Michigan and undisputedly do not have established places of business in Michigan.  (Ford's Mot. at 9.) Ford points to Defendants' counterclaim, which states that Auto is a Syrian corporation located in Syria and that Orient is a limited liability company with its principal place of business in Iraq, to show that Defendants cannot maintain an MDA claim.  (Ford's Mot. at 9, Countercl. ¶¶ 4, 5.)

Defendants state that this case is one of first impression and frame the issue as whether the MDA applies to the GIDSSAs and foreign persons.  (Defs.' Resp. at 11.) Defendants argue that the Court should apply the MDA to this case for three reasons: (1) there is no rational basis to exclude Auto or Orient from the protections the MDA provides to dealerships, and excluding them so would violate public policy "under the unique facts of this case;" (2) applying the law, as Ford analyzes it, to the GIDSSAs, demonstrates Ford's bad faith in drafting the GIDSSAs and makes the choice-of-law provision in the adhesion contracts unconscionable; and (3) Ford is estopped from taking an inconsistent position regarding the MDA[.] (*Id.*)

---

[3]"Established place of business" means a permanent, enclosed commercial building located within [Michigan] easily accessible and open to the public at all reasonable times and at which the business of a new motor vehicle dealer, including the display and repair of motor vehicles, may be lawfully carried on in accordance with the terms of all applicable buildings codes, zoning, and other land-use regulatory ordinances.  Mich. Comp. Laws. § 445.1563, s. 3 (2).

15

The Court rejects Defendants' arguments and agrees with Ford.  In Michigan, when a court is interpreting a statute, "[t]he primary goal . . . is to give effect to the [Michigan] Legislature's intent, focusing first on the statute's plain language."  *Greenville Lafayette, LLC v. Elgin State Bank*, 818 N.W.2d 460, 462 (Mich.Ct.App. Apr. 17, 2012) (citation omitted).  "The language is read according to its 'ordinary and generally accepted meaning.'"  *Id.* (citation omitted).  "Where the language of the statute is clear, [courts] enforce the statute as written because the Legislature must have intended the meaning it plainly expressed."  *Id.* (citation omitted).  *See also Douglas v. Allstate Ins. Co.*, 821 N.W.2d 472, 481 (Mich. 2012).

The parties have not pointed the Court to any Michigan case that has addressed this specific MDA provision.  The Court has not found any cases either. In the absence of a Michigan Supreme Court decision, a federal court must "attempt to predict what the Michigan Supreme Court would do if confronted with the same questions."  *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 765 (6th Cir. 2012) (citation omitted).  A federal court should consider "decisions of the Michigan Court[s] of Appeals as well as relevant Michigan Supreme Court dicta, restatements of law, law-review commentaries, and the rules adopted by other jurisdictions."  *Id.* (citation omitted).

Here, the MDA is clear, its provision do not apply to dealerships that are not physically located in Michigan.  Because Auto and Orient's dealerships are not physically located in Michigan, they cannot avail themselves of the MDA's provisions.

While Defendants do point to several cases to support their argument that the MDA should apply extra-territorially, these cases fail to persuade the Court.  The Court finds that both offered cases are distinguishable from the circumstances of this case.

16

Defendants first point to *Infomax Office Systems, Inc. v. MBO Binder & Co. of America*, 976 F.Supp. 1247 (S.D.Iowa 1997).  In *Infomax*, the plaintiff-dealership filed suit against the defendant-manufacturer.  The plaintiff alleged, among other counts, that the defendant violated the Illinois Franchise Disclosure Act (IFDA).  *Infomax*, 976 F.Supp.at 1248-49.  The parties' agreement contained a choice-of-law provision that stated the agreement "shall be governed and construed in accordance with Illinois law and shall be deemed to have been entered into [the defendant's] offices in Westmont, Illinois." *Id.* at 1249 (emphasis removed).  The defendant alleged that the IFDA did not apply to the plaintiff because the plaintiff was not located in Illinois.  *Id.*  The court rejected that allegation and found that the parties agreed that Illinois law would apply and that the court must rule as if the parties "were within the ambit of Illinois law," including the IFDA.  *Id.* at 1254.  The court found that the Sixth Circuit's *Highway Equipment* case was not compelling.  *Id. See Highway Equip. Co. v. Caterpillar Inc.,* 908 F.2d 60, 63 (6th Cir. 1990) (holding that the Illinois Franchise Dealership Act only applied to Illinois residents and that that holding was supported by the fact that the Illinois legislature, in 1988, reenacted the IFDA and "confirmed that the statute [wa]s intended to protect Illinois residents only.").

Defendants next point to *Burger King Corp. v Austin*, 805 F.Supp. 1007 (S.D.Fla. 1992).  *Burger King* presents another similar fact pattern and issue: whether the Florida Franchise Act (FFA) applied to a dealership outside of Florida.  805 F.Supp. at 1022-23. The court found that the FFA did apply to extraterritorial dealerships.  *Id.*  The court noted that the FFA contained no provisions that it applied only to in-state dealerships.  *Id.*  The court found that the FFA applied to those entities or persons doing business in Florida, which could apply to dealerships outside of Florida.  *Id.*  But there, the court noted that, "[i]f

17

the Florida legislature had included a phrase that specifically limited the [FFA's] application to Florida residents or domiciliaries, the Court would not have determined that the [FFA] was applicable to this contract, i.e., the parties' intent in including a choice of law provision in a contract cannot be used to override the clear intention of the legislature." *Id.* at 1023, n. 24.

The Court first notes that neither of these cases is binding upon the Court.

As to *Infomax*, the Court is bound by the Sixth Circuit's interpretation of the IFDA provided in *Highway Equipment.* The Court further notes that the choice-of-law provision at issue in that case stated that the contract was executed as if executed in Illinois. Here, the GIDSSA dispute resolution choice-of-law provisions state that "[t]he substance and procedural law of the State of Michigan, without regard to its conflict of laws rules, shall apply to the proceedings and the parties agree to accept such jurisdiction." Given *Highway Equipment* and the difference in the choice of law provision in *Infomax*, the Court finds the case unpersuasive.

As to *Burger King*, the court there specifically noted the Florida legislature did not contain a phrase that limited the FFA's application to Florida residents or domiciliaries. That fact alone removes any persuasive value from *Burger King.*

Defendants finally point to *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977) to suggest that the Wisconsin Fair Dealership Law, and by analogy the MDA, does not prohibit out-of-state dealerships from enforcing state-restricted dealership laws. But Defendants fail to point out that the *Boatland* holding was superceded when Wisconsin amended its statute and by case law, which the Sixth Circuit noted in *Highway Equipment Co. v. Caterpillar Inc.,* 908 F.2d 60 (6th Cir. 1990).

18

Ford argues that Defendants cases are unpersuasive and suggests that the Sixth Circuit would not interpret the MDA as Defendants argue.  Ford also points to several out-of-jurisdiction federal courts that have stated, in passing, that the MDA does not apply to dealerships outside of Michigan.  The Court is more persuaded by Ford's illustrative cases.

Ford points to *Bimel-Walroth Co. v. Raytheon Co.*, 796 F.2d 840 (6th Cir. 1986).  In *Bimel*, the Sixth Circuit addressed whether a Wisconsin choice-of-law provision in a manufacturer-dealership contract could allow out-of-state dealerships to file suit under the Wisconsin Fair Dealership Law (WFDL) when the WFDL expressly stated that it only applied to a "dealership situated in [Wisconsin.]"  796 F.2d at 842.  The Sixth Circuit held that "situated in this state" was "facially unambiguous."  *Id.*  The Sixth Circuit noted that that phrase applied to a "dealer," which the WFDL, then-recently amended, defined as "a person who is a grantee of a dealership situated in the State of Wisconsin."  *Id.* (citation omitted).  The court found that the recent amendment made it "abundantly clear" that the WFDL would only apply to those dealers geographically "situated" in Wisconsin.  *Id. And see Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 41 (1st Cir. 2002) (noting that, the MDA "on its face" "does not apply to dealers located outside the state of Michigan.");  *Bill Call Ford, Inc. v. Ford Motor Co.*, 830 F.Supp. 1053, 1058 (N.D.Ohio 1993) (also noting that the MDA has no application to dealers outside of Michigan.).

Here, the MDA is clear, it does not apply to dealerships.  The Court, moreover, recognizes that, while *Bimel* addresses Wisconsin law as applied by the Sixth Circuit, the case is persuasive in how the Sixth Circuit would interpret the MDA, in the absence of Michigan court authority.

19

Defendants finally argue that judicial estoppel and/or the doctrine of preclusion prohibits Ford from alleging that the MDA does not apply.  (Defs.' Resp. at 16.)  Defendants state that Ford has maintained, under the Automobile Dealer's Day in Court Act, which only applies to residents of the Untied States, prohibits Defendants from saying that the MDA does not apply.  (*Id.*) *See* 15 U.S.C. § 1221(c)(defining "automobile dealer" as "any person, partnership, corporation, association, or other form of business enterprise resident in the United States[.]").   In its reply, Ford acknowledges that it has taken the position, under 15 U.S.C. § 1226, that it is not obliged to arbitrate the dispute with Defendants.  (Ford's Reply at 3.)  But Ford also maintains that its position is not inconsistent with the argument that the MDA only applies to dealerships in Michigan.  (*Id.*)

The Court agrees with Ford.  The Court first notes that the issue whether the ADDCA applies is not slated for adjudication at the moment.  The Court further notes that the complaint states that Auto and Orient's dealerships are not in Michigan.  They cannot therefore state a claim under the MDA.

The Court dismisses the MDA claims with prejudice.

### B. Defendants have not stated  plausible claims of breach of fiduciary duty or taking of trade secrets and corporate opportunity

Ford seeks dismissal of Defendants' breach of fiduciary duty, taking of trade secrets, and taking of corporate opportunity claims.  The Court finds that dismissal of these claims is appropriate, as Defendants have not alleged facts that support that a fiduciary relationship exited between the parties.  For all of Defendants' claims arise from the GIDSSAs and no greater duty on Ford's behalf stems from the contracts or from the allegations in the counterclaim.

20

In the counterclaim, Auto alleges that it and Ford had a long-term manufacturer-dealer and confidential relationship. (Countercl. ¶ 137.) The manufacturer-dealer relationship was based upon the GIDSSA and the parties' course of performance. (*Id.*) This relationship, Auto alleges, had the effect of Auto placing its trust in Ford, requiring Ford to advise Auto as to the scope of their relationship, and resulted in Ford having superiority over Auto. (*Id.*) The confidential relationship, Auto asserts, gave Ford the duty to not disclose Auto's proprietary information. (*Id.*)

Auto claims that Ford had a "heightened duty to act in good faith in its relationship with Auto[] because it drafted the adhesion uniform contract it provided to Auto . . . broadly so as to allow the parties to interpret their relationship through their course of performance based upon each country's religions, traditions, laws, and historical culture." (Countercl. ¶ 138.) Based upon the broad wording and malleability, Auto alleges that "Ford had a heightened duty to advise Auto regarding the terms of its relationship with Ford." (*Id.* ¶ 139.) Auto further alleges that Ford had a special relationship with it because Ford had access to Auto's confidential and proprietary business information, including contacts, business opportunities, and business plans. (*Id.* ¶ 140.)

Auto alleges that Ford breached its duty to advise it concerning the scope of their relationship after the President entered the 2011 Executive Order. (*Id.* ¶ 141.) Auto states that Ford misreads the 2011 EO. (*Id.*) Auto also claims that Ford breached its duty of confidentiality by using Auto's confidential business practices and making plans in other Middle Eastern countries. (*Id.* ¶ 142.) Auto finally claims that Ford has damaged it by taking its trade secrets, its corporate opportunities, and breaching the fiduciary duty owed. (*Id.* ¶ 143.)

21

Orient alleges much of the same in its count against Ford.  (Countercl. ¶¶ 144-151.)
Orient also alleges that Ford breached its duty to advise Orient about the scope of their
relationship by "unilaterally chang[ing] the scope of the agreement and threaten[ing]
termination." (*Id.* ¶ 149.)  Orient states that Ford failed to give it Ford's promised sixty days
to cure the alleged breach.  (*Id.*)  Orient also claims that it suffered damages as a result of
the breach.  (*Id.* ¶¶ 150, 151.)

Defendants argue that manufacturers and dealers can establish fiduciary relationships
and that they have pleaded sufficient facts of a fiduciary relationship with Ford and a breach
of that relationship to survive a motion to dismiss.  (Defs.' Resp. at 18.)

Defendants state that whether a fiduciary relationship exists is a fact-specific inquiry.
(Defs.' Resp. at 19.)  They state that the inquiry is one that looks to whether one party has
put its faith, confidence, and trust in another's judgment and advice.  (*Id.*)

Defendants maintain that they have pleaded that they put such faith, confidence, and
trust in Ford's judgment. (Defs.' Resp. at 20.)  Defendants specifically argue that they have
alleged "substantial imbalances of knowledge, power, and capability between themselves
and Ford that elevated their dealings beyond a mere business relationship, that Auto and
Orient relied upon Ford's judgment, and that Ford accepted this trust and confidence." (*Id.*)
 Defendants suggest that this fiduciary relationship was created, in part, given the unique
nature of the GIDSSA, which was "open-ended" and so malleable to allow Ford to interpret
and enforce the agreement unjustly.  (*Id.*)  Defendants maintain that the GIDSSA is an
adhesion contract that gives "great power" to Ford "to dictate to the dealer with the constant
threat of termination for non-compliance with the manufacturer's demands."  (*Id.*)

22

Ford argues that Defendants cannot state fiduciary duty claims because "there is no fiduciary or confidential relationship between a motor vehicle manufacturer or a dealer." (Ford's Mot. at 11.)  Ford points to a number of cases in Michigan, this circuit, and other jurisdictions applying Michigan law that supports its argument that Michigan law does not support a manufacturer-dealer fiduciary relationship.

A fiduciary duty arises between parties in a fiduciary relationship.  *Bero Motors v. Gen. Motors Corp.*, 224190, 2001 WL 1167533, at *4 (Mich.Ct.App. Oct. 2, 2001).  "A fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another."  *Ulrich v. Federal Land Bank of St. Paul*, 480 N.W.2d 910, 911 (Mich.Ct.App. 1991) (citation omitted) (holding that the plaintiff's allegations of inexperience and reliance on the defendant were insufficient to claim a fiduciary relationship.) (And contrasting a Michigan case where a fiduciary relationship was found between a sick borrower of a construction loan and the lender had "active involvement in the construction process on behalf of the borrower, and the lender repeatedly assured the borrower that the construction was going according to schedule.").  Traditional examples of fiduciary relationships are: trustees to beneficiaries; guardians to wards; attorneys to clients; and doctors to patients.  *Id.* (citations omitted).  Generally, whether a fiduciary relationship exists outside of the familiar examples is a question of fact.  *Id.* citing *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 309 N.W.2d 645, 648 (Mich.Ct.App. 1981) (citation omitted).  Michigan courts, though, have "been reluctant to extend the cause of action for breach of fiduciary duty beyond the traditional context."  *Id.* citing *Teadt v. Lutheran Church Missouri Synod*, 603 N.W.2d 816, 823 (Mich.Ct.App. 1999).  "[Breach of fiduciary duty] [r]elief is granted when such position of influence has

23

been acquired and abused, or when confidence has been reposed and betrayed." *Treadt*, 603 N.W.2d at 823 (citation omitted). "A person in a fiduciary relation[ship with] another is under a duty to act for the benefit of the other with regard to matters within the scope of the relation." *Id.* (citation omitted).

Ford first points to *Bero* to support its argument that, under Michigan law, Defendants cannot state a claim for breach of fiduciary duty because, by law, no fiduciary relationship exists between a manufacturer and dealership. In *Bero*, in a motion akin to summary judgment, the court held that a fiduciary relationship did not exist between a dealership and manufacturer. 2001 WL 1167533, at *5. The court reasoned that the plaintiff could not fashion a fiduciary relationship with "simple allegations of reliance" upon the manufacturer when both were "experienced for-profit entities in a commercial setting." *Id.* The court also pointed out that the parties' agreement contained a paragraph that stated that no fiduciary obligations were created by the agreement. *Id.* That statement, the court reasoned, provided "notice" of the parties' "course of business and thus any reposing of faith, confidence, and trust, and reliance upon the judgment and advice of another by [the] plaintiff would have been misplaced, self-defeating and unwise." *Id.* (citation omitted). The court asserted again that the parties' relationship was "driven by profits," and the plaintiff's "mere expression that it relied on GM to effect the oral promise is unconvincing against a commercial backdrop where sophisticated entities. . . regulate the minutiae of their relationship through written contracts." *Id.*

Ford then points to several cases that applied *Bero* and have found no fiduciary relationship between parties outside of the traditional fiduciary relationships. *See Jarbo v. BAC Home Loan Servicing*, 10-12632, 2010 WL 5173825, at *15 (E.D.Mich. Dec. 15, 2010)

24

(Edmunds, J.) (quoting *Bero* and granting the motions to dismiss the plaintiff's breach of fiduciary duty claims because Michigan courts have not recognized a duty in the bank/lender relationship. And also holding that "allegations of inexperience and reliance . . . are insufficient to claim a fiduciary relationship.") (citation omitted); *O'Neal v. Burger Chef Sys. Inc.*, 860 F.2d 1341, 1349, n. 4 (6th Cir. 1988) (collecting cases for the proposition that franchise agreements generally do not give rise to fiduciary or confidential relationships between the parties.); *Ray Skillman Oldsmobile & GMC Truck, Inc. v. General Motors Corp.*, 05-0204, 2006 WL 694561, at *6 (S.D.Ind. Mar. 14, 2006) (applying Michigan law and stating that a "fiduciary duty arises out of a relationship between parties where one reasonably reposes faith, confidence and trust in the judgment and advice of the other." And holding that a "written agreement between two businesses whose relationship is driven by profit, and which specifically states that no fiduciary is created, negates any concern that one is placing blind faith in the judgment of the other."); *Crest Cadillac Oldsmobile, Inc. v. General Motors Corp.*, 05-00051, 2005 WL 3591871 (N.D.N.Y. Dec. 30, 2005) (on a motion to dismiss, summarily stating that Michigan law does not recognize a fiduciary relationship between a manufacturer and a dealership and pointing out that the agreement between the parties expressly precluded a fiduciary relationship.) (citation omitted); *and Robert Basil Motors, Inc. v. General Motors Corp.*, 03-315A, 2004 WL 1125164, at *9 (W.D.N.Y. Apr. 17, 2004) (citing *Bero* and finding, on a motion to dismiss, that a fiduciary relationship does not exist between a franchisor and a franchisee, and also noting that the parties' agreement expressly stated that the agreement did not create any fiduciary obligations.).

Defendants first point to *Riverside Auto Sales, Inc. v. GE Capital Warranty Corp.*, 03-55, 2004 WL 2106638 (W.D.Mich. Mar. 30, 2004) (Quist, J.), to support their breach of

fiduciary duty claims.  In *Riverside*, the plaintiff dealerships and their principals filed suit against the defendant, a financial services company.  2004 WL 2106638, at *1.  The parties entered into the dealer agreement.  *Id.*  The dealer agreement required the plaintiffs to sell extended warranties to customers and then "receive as compensation [from the defendant] the difference between the retail price at which they chose to sell the [e]xtended [w]arranties and a rate card amount set by [the] defendant."  *Id.*  The court noted that the plaintiffs' "core grievance" with the defendant was that the defendant misrepresented the amount of money that would reach the plaintiffs through the reinsurance agreement.  *Id.* at *2.  The plaintiffs alleged that the defendant made oral representations that they would receive more compensation than they actually did.  *Id.*

Among other claims, the plaintiffs alleged a breach of fiduciary duty claim.  *Riverside*, 2004 WL 2106638, at *7-8.  The defendant argued that there was no fiduciary relationship between the parties and therefore no breach of duty cause of action could exist.  *Id.* at *7.  The plaintiff dealerships and principals alleged that the defendant created a fiduciary relationship with them.  *Id.* at 8.  The plaintiff principals asserted that the defendant promised that all they had to do "was sit back and collect the profits from their investment."  *Id.*  The court noted that the plaintiff principals alleged that the defendant handled "all aspects of formation and subsequent operations," including incorporation, making all necessary regulatory filings and communications, getting licenses, handling tax matters, and distributing shares of stock.  *Id.*  The plaintiff dealerships alleged that it had a fiduciary relationship with the defendant because the defendant managed the sales business; provided all forms, brochures, and supplies; kept records of all the sales; administered the handling of claims; authorized the performance of covered repairs; reimbursed the

26

dealerships for repairs; offered consulting services; and conducted training for dealer sales personnel. *Id.* The court pointed out that the plaintiffs, in their amended complaint, repeatedly emphasized the plaintiffs' reliance on the defendant's "relative greater knowledge, expertise, power, and control." *Id.*

The court stated that whether a fiduciary relationship existed, other than in a well-defined category, was a question of fact. *Riverside*, 2004 WL 2106638 at *7 (citations omitted). The court stated that, given the plaintiff's allegations, it was unable to determine whether a fiduciary relationship existed. *Id.*

Defendants then point to *Franklin Park Lincoln-Mercury v. Ford Motor Co.*, 09-792, 2010 WL 2650041 (N.D.Ohio July 2, 2010). In *Franklin*, the dealership-plaintiff filed suits against Ford for breach of fiduciary duty, as well as other claims. 2010 WL 2650041, at *1. The dealership alleged that Ford breached its fiduciary duty when Ford knew of and participated in a rival dealership's purchase negotiations with a third dealership and Ford knew that the area would not support two Lincoln-Mercury dealerships. *Id.* at *2. There, Ford filed a motion for judgment on the pleadings/to dismiss. *Id.*

The court addressed the fiduciary duty claim, in which the plaintiff alleged that Ford breached its fiduciary duty by violating three sources of law: the sales agreement, the Ohio Motor Vehicles Dealers Act, and the federal ADDCA. *Franklin*, 2010 WL 2650041, at *3. Ford argued there, as here, that no fiduciary relationship arises out of franchisor-franchisee, manufacturer-dealer, arm's length relationship between Ford and the dealer. *Id.* The court noted that, while the parties disagreed over whether to apply Michigan or Ohio law, the differences between the two states' laws were minute and application of either would result in the same outcome. *Id.* The court stated that generally no fiduciary

27

relationship existed between a franchisor and a franchisee absent an express statutory provision creating a fiduciary relationship or absent an understanding, held by both parties to the subject agreement "that a special trust and confidence has been reposed by the franchisee in the franchisor." *Id.* (citation omitted). The court further specifically noted that the general rule had extended to Ford's franchise agreements. *Id.* (citation omitted). The court held that only in situations where there are "exceptional circumstances" had a court found a fiduciary relationship. *Id.* at *4 (citation omitted). The court reviewed the type of provisions in an agreement that would constitute "exceptional circumstances." *Id.* The court found that when a franchisor retained "the authority to exercise near life and death economic power over" the franchisee and the agreement required the franchisee to provide reports concerning sales, inventories, customer data, and all information concerning the franchisee's business, the franchisee could sustain a breach of fiduciary duty claim. *Id.* (citation omitted).

The *Franklin* court held that the plaintiff-dealership could survive Ford's motion to dismiss because the plaintiff alleged facts in its complaint that tracked the "exceptional circumstances" that other courts had found sufficient to state a breach of fiduciary duty claim. 2010 WL 2650041, at *4. The court noted that it did not have the franchise agreement to verify the plaintiff's allegations that the agreement required the plaintiff to provide "confidential and proprietary information to Ford, created a confidential relationship," and made the plaintiff "dependent upon Ford for economic survival." *Id.* These allegations, the court held, were sufficient to withstand a motion to dismiss. *Id.*

Here, Ford acknowledges the *Franklin* opinion, but then points out that when the parties submitted the agreement, at the summary judgment stage, the court held that no

28

clauses in the agreement created "the authority to exercise near life and death economic power over" plaintiff, as the plaintiff had alleged in the complaint. *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 09-792, 2011 WL 5361738, at *2-3 (N.D.Ohio Oct. 31, 2011). The court rejected the plaintiff's arguments that certain clauses in the agreement created a fiduciary relationship. *Id.* The court noted that none of the following created a fiduciary relationship: the requirement of using Ford's accounting system; reporting sales requirements as requested by Ford; the requirement of keeping records; and the requirement that the dealership submit to audits as requested by Ford. *Id.* at *3. The court further noted that the plaintiff never had to provide prospective customer lists or information related to its financing, information which could lead to a confidential relationship. *Id.* The court finally rejected the plaintiff's allegations that the fact that Ford had a disproportionate power created a fiduciary relationship. *Id.* The court stated that "vigorous and aggressive promotion and advertising; performance objectives; specific vehicle inventory; minimum capital; minimum staff; use of [Ford's] signs; appearance of the premises; right of first refusal in the event of a sale; grounds for termination; and approval for any change in franchise ownership," did not create a fiduciary duty. *Id.* The court reasoned, "this laundry list is typically found in dealer contracts." *Id.* The court held that the plaintiff had failed to point to any contract provision or case law that suggested its relationship with Ford was anything other than a typical franchisor-franchisee relationship. *Id.*

The Court grants Ford's motion to dismiss the breach of fiduciary duty claims. Defendants do not make allegations that take this case's controversy outside of a commercial setting. Defendants' allegations arise from the GIDSSAs. Defendants have alleged that Ford crafted the GIDSSAs's broad terms so that a course of performance

29

would fill in the open terms of the contracts based on Defendants' localities's religions, traditions, laws, and historical cultures. Defendants also allege that a fiduciary relationship existed because Ford had access to all of Defendants' confidential and proprietary business information. And Defendants maintain that the GIDDSAs gave Ford the ability to unilaterally change the scope of the agreements and threaten termination if Defendants did not comply with its demands. These allegations support a breach of contract claim, they do not create or allege a fiduciary relationship from which a breach of fiduciary relationship claim can derive.

The Court also finds that Defendants' breach of fiduciary duty claims are not well-pleaded. Aside from conclusorily stating that they placed their trust and confidence in Ford and that Ford had access to Defendants' confidential information, Defendants do not allege how they relied to their detriment or how they suffered. Defendants also do not allege what confidential information Ford had access to that would create a confidential relationship. The Court finds that this lack of specificity is also grounds from which to grant Ford's motion to dismiss.

Following *Bero* and the ample authority in Michigan that no fiduciary relationship exists between a manufacturer and a dealership and given that Defendants have not made allegations that are outside of a commercial setting or outside of a breach of contract claim, the Court grants Ford's motion to dismiss the breach of fiduciary duty claims.

Ford states that Defendants' Counts V and VI are also labeled as the taking of trade secrets and corporate opportunity. (Ford's Mot. at 12.) Ford argues that Defendants have not pleaded the elements of any "trade secret" or "corporate opportunity" claim. (*Id.*) Ford also argues that Auto and Orient have not pleaded sufficient facts to support their

30

allegations of using Defendants' confidential business practices and marketing plans in expanding in the Middle East Auto) and expanding in Iraq (Orient).  (*Id.* at 12-13.)  Ford points out that Defendants have not alleged what "confidential" information was misused or how it was misused; have never alleged to whom the information was disclosed, or when, or why, and never identifies the other Middle Eastern countries into which Ford allegedly expanded or the competitive dealers with whom Ford expanded.  (*Id.* at 13.)

Defendants do not address the trade secrets or corporate opportunity issues in their response.  The Court agrees that Defendants have not properly pleaded allegations in support of these claims.  If Defendants meant to assert these claims, they did not do so properly; the Court dismisses them with prejudice.

## C. Defendants have stated plausible unjust enrichment and promissory estoppel claims

Ford argues that Defendants' unjust enrichment and promissory estoppel claims cannot survive because express contracts exist between the parties.  (Ford's Mot. at 13.)

Auto alleges that "Ford has been unjustly enriched based on the benefits provided by Auto pursuant to promises made by Ford independent of the GIDSSA and based upon Ford's admitted long term manufacturer dealer relationship."  (Countercl. ¶ 153.)  Auto further alleges that it "promoted, marketed and sold Ford products throughout the country of Syria based on a confidential marketing plan developed and used by Auto and approved by Ford over an eight (8) year course of performance."  (*Id.* ¶ 154.)  Auto states that it had to expend funds for facilities, land, marketing, training, financing for the public, business personnel, service facilities, and other expenses. (*Id.* ¶ 155.)  Auto maintains that "Ford has retained the benefit Auto provided with its confidential marketing plan and the brand

recognition and good reputation developed for Ford by Auto in Syria." (*Id.* ¶ 156.)  Auto further maintains that it "reasonably expected to be compensated for its investments, confidential business plans and contacts and its hard work, including future profits." (*Id.* at 157.)  And Auto concludes that Ford, by terminating its relationship with Auto, instead of suspending the relationship, "has refused to provide compensation reasonably expected by Auto." (*Id.* ¶ 158.)

Orient's unjust enrichment assertions echo Auto's, save for the assertions relating to Iraq instead of Syria.  (Countercl. ¶¶ 160-167.)

In its promissory estoppel claim, Auto alleges that, "[i]ndependent of the written agreement[,] Ford promised that this [relationship] was a long term manufacturer dealer relationship[.]" (Countercl. ¶ 169.)  Auto also alleges that, "[i]ndependent of the written agreement[,] Ford promised to provide Ford products to Auto for Auto to make sales throughout the entire country of Syria through third party traders." (*Id.* ¶ 170.)  Given the promises, Auto states that it "justifiably relied to its detriment on Ford's promise by investing in land, facilities, training, marketing, storage, business personnel, financing for public, service facilities," and expected profits. (*Id.* ¶ 171.)

Again, Orient's allegations mirror Auto's with respect to the promissory estoppel claim. (Countercl. ¶¶ 175-81.)

Defendants argue that they have appropriately pleaded unjust enrichment and promissory estoppel claims.  (Defs.' Resp. at 23.)  Defendants further argue that they are allowed to plead these claims in the alternative to their breach of contract claim.  (*Id.*)  Defendants also suggest, given that Ford has asserted the breach of contract defenses of

32

impossibility and impracticability, that they could be entitled to damages for restitution and/or reliance under these theories. (*Id.*)

To sustain an unjust enrichment claim, a plaintiff must allege (1) the receipt of a benefit by the defendant from the plaintiff that (2) results in an inequity to the plaintiff due to the defendant retaining the benefit. *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich.Ct.App. 2003).

Promissory estoppel requires:

(1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided.

*Hardaway v. Wayne County*, ___ N.W.2d ___, 2012 WL 5846557, at * 4 (Mich.Ct.App. Oct. 30, 2012) (citation omitted).

While Defendants are correct that they can plead alternative claims, in some instances, a breach of contract claim will preclude unjust enrichment or promissory estoppel claims.[4]  *See Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F.Supp. 484, 491 (E.D.Mich. 1993) (Feikens, J.) ("If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract." "In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract.") (citations omitted).  *See*

---

[4]"A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed.R.Civ.P. 8(d)(2).  "A party may state as many separate claims or defenses as it has, regardless of consistency."  Fed.R.Civ.P. 8(d)(3).

33

also *Groeb Farms, Inc. v. Alfred L. Wolff, Inc.*, 08-14624, 2009 WL 500816, at *7 (E.D.Mich. 2009) (Borman, J.) (stating, "[w]hile it is true that [a plaintiff] may plead breach of contract in one count and promissory estoppel in another, [a plaintiff] may not allege the existence of an express contract in its claim for promissory estoppel."  And quoting, "this basis is especially appropriate where . . . the plaintiff has attached the relevant contracts to the complaint.") (citations omitted).  *But see Ajuba Int'l, L.L.C. v. Saharia*, 871 F.Supp.2d 671 (E.D.Mich. 2012) (Battani, J.) (finding alternative pleading appropriate and allowing the unjust enrichment claims to go forward because the court did not find that the complaint's breach of contract claims expressly or unequivocally covered the same subject matter as the unjust enrichment claim;  but noting that plaintiffs, generally, "can plead their claim for unjust enrichment as an alterative to their claims for breach of contract so long as questions of fact exist as to the existence of a claim based on contract.") (citation omitted).  *And finally*, *Burton v. William Beaumont Hosp.*, 373 F.Supp.2d 707, 722 (E.D.Mich. 2005) (acknowledging that the Federal Rules permit a party to plead alternative claims, but stating that, "[a]n unjust enrichment claim is inconsistent with this circumstance, as unjust enrichment is not a viable claim if an express contract governs."  And stating, "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment.") (citations omitted).

The thrust of Defendants' counterclaim is whether the GIDSSAs remain enforceable and whether Ford breached the GIDSSAs.  While the breach of contract claim is the heart of the counterclaim, it is not before the Court on this motion to dismiss.

Because the breach of contract is not before the Court, the Court finds itself somewhat hampered in the adjudication of the unjust enrichment and promissory estoppel

claims.  Facially, Defendants have alleged the elements of those claims.  Defendants have additionally summarily alleged facts that appear to align themselves with the elements of those claims.

The Court recognizes that Defendants cannot recover on an equitable theory when an express contract governs the parties' relationship and the express contract's terms cover the same interactions from which a party is seeking relief on an equitable claim.

Here, the Court finds that Defendants' allegations in support of their unjust enrichment and promissory estoppel theories are intertwined with the contracts: the confidential marketing plan; the expenses for building, starting, and maintaining the dealerships, the promises of an extended duration, and the alleged agreement to permit the sale of vehicles to third party traders, etc.  But, even given the intertwinedness, the Court finds that dismissal is not appropriate.

As Defendants point out, Ford has raised the defense of impracticability of the contracts.[5]  The Court cannot say, given the defense and the fact that the breach of

---

[5]Various sections of the Restatement (Second) of Contracts address impracticability, frustration of purpose and some of the remedies available:

Restatement (Second) of Contracts § 261
"Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."

Restatement (Second) of Contracts § 264
"If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."

Rationale: "It is 'a basic assumption on which the contract was made' that the law will not directly intervene to make performance impracticable when it is due.  Therefore, if

35

contract claims are not before the Court, that the equitable theories are out of the realm of possible outcomes on a motion to dismiss.  *See H.J.Tucker Assoc., Inc. v. Allied Chucker and Eng'g Co.*, 595 N.W.2d 176, 188 (Mich.Ct.App. 1999.) ("In the present case, the trial court could have found that an express contract was originally formed between the parties but that subsequently the contract was no longer in force.  Under such circumstances, [the] plaintiff could have recovered for breach of contract for the period when the contract was in force and could have recovered on an implied contract basis for the period when there was no contract in force.  Alternatively, the court could have found that the express verbal agreement between the parties covered certain subjects concerning [the] plaintiff's commissions but did not cover other subjects.").  *See also Greg Constr. Co. v. Mitchell Buick Sales, Inc.*, 177632, 1996 WL 33359281, at *2 (Mich.Ct.App. Sept. 10, 1996) ("Restitution is awarded under an equitable theory of implied contract or quasi contract to prevent unjust enrichment at the expense of another party." "It is an appropriate remedy

---

supervening governmental action prohibits a performance or imposes requirements that make it impracticable, the duty to render that performance is discharged, subject to the qualifications in § 261.  The fact that it is still possible for a party to perform if he is willing to break the law and risk the consequences does not bar him from claiming discharge.  The rule stated in this Section does not apply if the language or the circumstances indicate the contract.  With the trend toward greater governmental regulation, however, parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions, as where governmental approval is required for his performance and he assumes the risk that approval will be denied[.]  Such an agreement is usually interpreted as one to pay damages if performance is prevented rather than one to render a performance in violation of law[.]"

Restatement (Second) of Contracts § 377 (1981)
A party whose duty of performance does not arise or is discharged as a result of impracticability of performance, frustration of purpose, non-occurrence of a condition or disclaimer by a beneficiary is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

in cases of impracticability and frustration of purpose." *Id.* (citation omitted).  In *Mitchell*, the court, in affirming an arbitration award, held that the contractor plaintiff could succeed on an unjust enrichment theory for expenditures it made on engineering and architectural services because those services 'were made in preparation for the construction work" and could "be characterized as conferring a benefit on defendant because they are tailored to its property and can be used at a later date." *Id.*  But the court held that the plaintiff could not recover for the electrical materials it purchased because the materials were purchased by plaintiff "in order to be able to start construction when the permits were obtained. They do not confer any benefit on [the] defendant.") (citations omitted).  *And finally*, *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 939-40 (6th Cir. 1989) (stating, "losses suffered in reliance on representations may invoke estoppel principles even where the other party may not be enriched." But also holding that any reliance for a promissory estoppel claim must be "reasonable reliance.").

The Court also notes that Ford has not met its burden to show that Defendants have not stated a claim upon which the Court could grant relief.  While Ford has stated, extensively, that neither party is going to dispute that express contracts existed between the parties, Ford does not show how the GIDSSAs's provisions overlap Defendants' allegations in the unjust enrichment and promissory estoppel claims.

While the Court notes that Defendants appear to be disputing terms, scope, and effect of the GIDSSAs, without a careful parsing of the contracts and appropriate factual development, the Court cannot say that Defendants have not stated a rough plausible claim to relief.

37

**VI.    Conclusion**

For the above-stated reasons, the Court GRANTS in PART and DENIES in PART

Ford's motion to dismiss Defendants' counterclaims.  The Court dismisses Defendants'

MDA, breach of fiduciary duty, and taking of trade secrets and corporate opportunity claims

and allows the unjust enrichment and promissory estoppel claims to proceed.

So ordered.


s/Nancy G. Edmunds                                        
Nancy G. Edmunds
United States District Judge

Dated:  May 15, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record
on May 15, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams                        
Case Manager
Acting in the Absence of Carol Hemeyer