UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Ford Motor Company,

        Plaintiff,

v.

Ghreiwati Auto et al.,

        Defendants.

_____/

Case No. 12-14313

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING FORD'S MOTION FOR SUMMARY JUDGMENT
AND DISMISSING GHREIWATI'S BREACH OF CONTRACT, UNJUST
ENRICHMENT, AND PROMISSORY ESTOPPEL CLAIMS [28]**

Before the Court is Ford's motion for summary judgment against Ghreiwati Auto

(Auto.). (Dkt. 28.) Ford, an American corporation, and Auto, a Syrian corporation, with its

principal place of business in Syria, entered into a dealership agreement in 2003. The

agreement established a dealership relationship between the parties and provided that

Ford would supply vehicles to Auto that Auto would sell in Syria. The agreement also

provided that Syria could use Ford trademarks in Syria. In 2004, President George W.

Bush issued Executive Order 13338, prohibiting certain exportation of goods to Syria. The

parities continued to perform under the dealership agreement, under a regulation that

permitted the exportation of items that contained United States origin products if the United

States portion of the export was less than ten percent of the total value of the export. On

August 17, 2011, President Barack H. Obama issued Executive Order 13582, enacting

more wide-spread prohibitions against Syria. Ford terminated its dealership agreement

with Auto a day later. Auto disputed Ford's right to terminate the dealership agreement.

Ford eventually filed this case, requesting a declaratory judgment that it did not improperly terminate the dealership agreement. Ford filed a motion to dismiss certain claims against Auto and co-Defendant Orient Development General Trading Co., L.L.C., not subject to this motion. On May 15, 2013, the Court granted in part and denied in part Ford's motion to dismiss. The Court dismissed the Michigan Dealer Act, breach of fiduciary duty, and the taking of trade secrets and corporate opportunity claims. (Dkt. 24; May 15, 2013 Order.) The Court, though, denied the motion to dismiss with respect to the unjust enrichment and promissory estoppel claims. The Court found that those claims were premature, given that the Court was not adjudicating the breach of contract claim. (*Id.* at 34-35.)

Ford now, before the close of discovery (set for April 1, 2014), has filed a motion for summary judgment. Ford now requests that the Court find that it properly terminated Auto's dealership agreement and therefore is not liable to Auto for the claims that Auto has asserted. Ford maintains that President Obama's August 17, 2011 executive order renders Ford's performance of the dealership agreement illegal and that Ford therefore had the right to immediately terminate the dealership agreement. Ford also requests that the Court dismiss Auto's equitable theory claims against it.

On October 23, 2013, the Court held a hearing on the motions. Because the Court finds that the 2011 executive order rendered Ford's performance of the agreement illegal, that Ford properly terminated the agreement under the terms of the agreement, and that Auto is not entitled to equitable relief under this case's circumstances, the Court GRANTS Ford's motion for summary judgment and dismisses the breach of contract, promissory estoppel, and unjust enrichment claims.

2

I.   **Facts**

Auto provides some relevant background.  (Auto's Resp. at 5-11; Auto's Resp., Ex. 1, Ghreiwati Aff.)

In 2003, Ford was looking to replace its existing dealer-importer in Syria. (Ghreiwati Aff. ¶ 3.)  Ford selected Auto, contingent upon Auto settling a dispute with Ford's former dealer.  (*Id.*)  Auto did so, in September, 2003, by buying out the former dealer for $1,250,000.00.  (*Id.*)

In October, 2003, Ford and Auto entered into the a letter of understanding (LOU). (Auto's Resp. at 5.)  Auto states that the LOU required Auto to purchase land and build six facilities in five different areas of Syria through late 2003 and 2004.  (*Id.* at 5-6.)  Auto did not immediately build the buildings, it states, because of the political climate in Syria.  (*Id.* at 6.)

On October 13, 2003, Ford and Auto entered into a Global Importer Service Dealer Sales and Service Agreement (GIDSSA) with Auto.  (Auto GIDSSA at 67.)  The GIDSSA lists Auto as a Syrian corporation with a principal place of business at Rami Street, Damascus, Syria.  (*Id.*)

The GIDSSA's purpose was to establish Auto as "an authorized dealer for the sale and service of [Ford] Products including [Ford] vehicles[.]" (Auto GIDSSA at 67.)   In entering the GIDSSA, the parties defined their responsibilities to each other and recognized that each was dependent upon the other "in achieving their mutual objectives of satisfactory sales, services and profits[.]" (*Id.*)

3

The GIDSSA provides that  "[Auto] shall vigorously and resourcefully promote and solicit the sale of Company Products in [Auto's] Locality and shall energetically develop the potential for such sales and obtain reasonable shares thereof in volumes that are satisfactory to [Ford]."  (GIDSSA Standard Provisions ¶ 2(a).)[1]

The GIDSSA also requires that Auto "be responsible for the importation of Company Products, including but not limited to payment of all applicable taxes, duties and fees and obtainment of all applicable licenses, clearances and certificates relating to customers, vehicle homologation and foreign exchange."  (GIDSSA Standard Provisions ¶ 2(a)(3).)

Auto had recurring duties under the GIDSSA; Auto had to inform Ford, each month, those products that it was going to order:

> [t]o enable the Company to schedule production efficiently, the Dealer shall furnish each month, on the date or dates and in the manner designated by the Company, an order or orders for Company products that the Dealer will purchase during such subsequent months as shall be designated by the Company and in connection therewith, or separately, as requested by the Company, estimates of the Dealer's requirements for Company Products for such succeeding months as the Company from time to time may request. . . . Each such order or estimate also shall be placed in accordance with the requirements fixed from time to time by the Company as to the minimum or maximum number of Company Products that may be ordered at any one time by the Dealer.

(GIDSSA Standard Provisions ¶ 2(b).)

---

[1]"Dealer's Locality" is the "geographical area designated in writing to the Dealer by [Ford] from time to time as the dear of the Dealer's sales and service responsibility for [Ford] Products[.]" (GIDSSA Standard Provisions ¶ 1(c).)  "Company Products" includes vehicles that Ford designed, parts and accessories made and remanufactured for Ford, vehicles made or remanufactured by Ford, and other products that Ford specified "from time to time."  (GIDSSA Standard Provisions ¶ 1(b).)

The GIDSSA sets forth the parties' rights with regards to service.  The GIDSSA required Auto to perform service on any Ford product that aligned with Ford standards. The GIDSSA required Ford to provide standards to which Auto had to comply:

> 3. Responsibility with Respect to Service
> (a) General.  The Dealer shall develop, maintain and direct a trained, competent service organization and shall render prompt, professional, courteous and willing service on all Company Products presented to its place of business for such purpose (including all Company Products purchased from another Company authorised source) in accordance with such standards and procedures as may be established by the Company from time to time in the Standards Manual or otherwise, and in accordance with all applicable motor vehicle laws and regulations in effect in the Dealer's Locality.

(GIDSSA Standard Provisions ¶ 3(a).

The GIDSSA also sets forth provisions that required Auto to submit claims for reimbursement and for Ford to reimburse those claims:

> (c) Warranty, Policy, Campaign, Recall and Program Service.  The Dealer shall perform all warranty and policy service on each Company Product presented to its place of business for service in accordance with the applicable warranty and policy and the provisions of the Warranty and Policy Manual or other Company Instructions.  All repairs paid for or reimbursed by the Company (e.g. warranty, owner notification programs etc.) shall be performed at the Dealer's or Sub-dealer's authorized premises unless prior written consent has been obtained from the Company.

(GIDSSA Standard Provisions ¶ 3(c).)  The warranty section also lists other duties relating to campaigns, submitting claims, record keeping, and reporting.  (GIDSSA Standard Provisions. ¶ 3(c)(1)-(4).

Ford also points out that the GIDSSA sets forth Auto's rights to use Ford's trademark:

> [t]he Dealer shall use, and shall have permission to use, the word "Ford" or any other trademark or trade name used or claimed by the Company or any Affiliate, coined words or combinations containing the same parts thereof, only in connection with business conducted by the Dealer contemplated and defined by this Agreement.

5

(GIDSSA Standard Provisions ¶ 11.)

The GIDSSA defines the means by which the parties may terminate the agreement. Relevantly, Ford can terminate the agreement at will, so long as it gives Auto one hundred and twenty days' notice.  (GIDSSA Standard Provisions ¶ 13(e).)  The GIDSSA contained more termination provisions, which are not relevant here.

Ford points out that the GIDSSA also contained a severability clause:

> If any provision of this Agreement is invalid, unenforceable or prohibited by law, the Company may elect either to terminate this agreement in its entirety or consider this Agreement divisible. . . [sic] and such provision shall be inoperative and the remainder of this Agreement shall be valid and binding and of like effect as though such provision were not included herein.

(GIDSSA Standard Provisions ¶ 26.)  Auto points to the GIDSSA's amendment paragraph:

> [n]otwithstanding anything in this Agreement to the contrary, the Company shall have the right to amend, modify or change this Agreement in case of legislation, government regulation or changes in circumstances beyond the control of the Company that might affect materially the relationship between the Company and the Dealer.

(GIDSSA Standard Provisions ¶ 24.)

The GIDSSA lists the duties upon termination of the agreement:

> 15. Obligations Upon Termination or Nonrenewal
> Upon termination or nonrenewal of this Agreement, the Dealer shall cease to be an authorized dealer in Company Products and shall immediately comply with the obligations listed below.
>
> (b)   Discontinuance of Use of Trademarks and Trade Names.  The Dealer shall at its own expense:
>
>   (1)   remove all signs erected or used by the Dealer, and bearing the name "Ford" or any other trademark or trade name used or claimed by the Company or any Affiliate, (except as such use may be permitted under existing agreements with the Company relating to

6

products of the Company or any Affiliate other than Company Products), or any word indicating the Dealer is an authorized dealer in Company Products.

(2)    erase or obliterate from letterheads, stationary, business forms and other papers used by the Dealer or by any business associated or affiliated with the Dealer the word "Ford" and all other above described trademarks and trade names, and all words indicating that the Dealer is an authorized dealer in Company Products.

(3)    permanently discontinue all advertising of the Dealer as an authorized dealer in Company Products.

(4)    refrain from doing anything whether or not specified above that would indicate the Dealer is or was an authorized dealer in Company Products, and

(5)    remove any such trademark, trade name, coined word or combination which has been used, with the prior permission of the Company, in the Dealer's firm name or trade name.

If after termination or nonrenewal of this Agreement the Dealer shall fail or refuse to comply with any of the requirements of this paragraph 15(b) the Dealer shall reimburse the Company for any costs and expenses including, without limitation, any attorney's fees incurred by the Company in connection with any action taken to enforce compliance with this paragraph 15(b).

After the parties had entered into the GIDSSA, President George H. W. Bush issued Executive Order 13338, titled "Blocking Property of Certain Persons and Prohibiting the Export of Certain Good to Syria." Exec. Order 13338, 69 Fed. Reg. 26751 (May 11, 2004).

Executive Order 13338 provided, in relevant part, that:

[n]o other agency of the United States Government shall permit the exportation or reexportation to Syria of any product of the United States, except to the extent provided in regulations, orders, directives, or licenses that may be issued pursuant to this order in a manner consistent with the SAA, and notwithstanding any license, permit, or authorization granted prior to the effective date of this order.

Exec. Order 13338, 69 Fed. Reg. 26751 (May 11, 2004).  One of the regulations provided

for a ten percent de minimis rule.  15 C.F.R. § 734.4(c).  This regulation allowed products

to be shipped to Syria so long as the value of these American products in the total item was

less than ten percent of total value.[2]

To explain how Ford continued shipping to Auto and continued performing the

GIDSSA with Auto, Ford has submitted the affidavit of Jim Benintende, Ford's director of

export operations and global growth initiatives.   (Ford's Mot. for Summ. J., Ex. 1,

Benintende Aff. ¶ 1.)  He states that, between 2002 and 2006, he served as the managing

director of Ford Middle East.  (*Id.* ¶ 2.)  As the managing director, he says that he was

responsible for "working with Ford importer-dealers in the Middle East, including Ghreiwati

Auto in Syria." (*Id.*)  After the parties entered into the GIDSSA in 2003, Benintende states

---

[2]10% De Minimis Rule.  Except as provided in paragraphs (a) and (b)(1)(iii) of this section and subjection and subject to the provisions of paragraphs (b)(1)(I), (b)(1)(ii) and (b)(2) of this section, the following reexports are not subject to the EAR when made to any country in the world[.]

(1) Reexports of a foreign-made commodity incorporating controlled U.S.-origin commodities or "bundled" with U.S.-origin software valued at 10% or less of the total value of the foreign-made commodity[.]

Notes to paragraph (c)(1): (1) U.S.-origin software is not eligible for the de minimis exclusion and is subject to the EAR when exported or reexported separately from (i.e., not bundled or incorporated with) the foreign-made item.

(2) Reexports of foreign-made software incorporating controlled U.S.-origin software valued at 10% or less of the total value of the foreign-made software; or
(3) Reexports of foreign technology commingled with or drawn from controlled U.S.-origin technology valued at 10% of less of the total value of the foreign technology. Before you may rely upon the de minimis exclusion for foreign-made technology commingled with controlled U.S.-origin technology, you must file a one-time report[.]

15 C.F.R. § 734.4(c).

that, in 2004, he learned of President Bush's 2004 executive order.  (*Id.* ¶ 3.)  He explains that, at that time, he learned that the executive order did not prohibit the sale of products manufactured by Ford affiliates in foreign countries, "provided that the U.S. content of such products was 10% or less." (*Id.*)  Benintende explains that, given the 2004 executive order, Ford altered its practices and sold "only products that were manufactured by Ford affiliates outside of the United States and that contained less than 10% U.S. content." (*Id.* ¶ 4.)

Auto confirms that Ford continued to do business with it under the ten percent de minimis provision.  (Auto's Resp. at 6.)  Auto states that Ford assured it that, if Auto built the facilities, then Ford could comply with the 2004 executive order under the de minimis rule.  (*Id.*)

Given Ford's representations, Auto states that it "made huge investments" in Syria. (Auto's Resp. at 7.)  From 2006 to 2011, Auto states that it invested $27,207.242.73 in the infrastructure, dealer network, and brand representation of Ford and its products.  (*Id.*; Ghreiwati Aff. ¶ 11.)  Also from 2006 to 2011, Auto states that it performed the GIDSSA "well" for Ford.  (*Id.*, Ghreiwaiti Aff. ¶ 13.)

On August 17, 2011, President Obama issued Executive Order 13582, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions with Respect to Syria."  Exec. Order No. 13582, 76 Fed. Reg. 52209 (Aug. 17, 2011).  Significantly, the executive order prohibited:

> (a) new investment in Syria by a United States person, wherever located;
>
> (b) the exportation, reexportation, sale, or supply, directly or indirectly, from the Untied States, or by a United States person, wherever located, of any services to Syria;
>
> * * *

9

(e) any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this section if performed by a United States person or within the United States.

*Id.*

On August 19, 2011, Ford called Auto and verbally terminated the GIDSSA pursuant to the August 17, 2011 executive order.  (Compl., Ex. C, August 22, 2011 Termination Letter.)  On August 22, 2011, Ford followed the call with a termination letter confirming the call and the GIDSSA termination.  (*Id.*)

After the termination call and letter, Auto states that Ford refused to respond to Auto.  (Ghreiwati Aff. ¶ 27.)  Auto expounds that Ford refused to respond, to explain its decision, to discuss alternative options, or to even attempt to assist with mitigating damages.  (*Id.*)  Auto further claims that Ford "even refused to pay the outstanding balance for warranty work provided by Auto in the amount of $122,424.58."  (*Id.*)  Auto lists more damages it claims stemmed from Ford's allegedly improper termination.  (*Id.* ¶ 29-30.)

After receiving the termination notices, Auto alleges that it  requested a meeting with Ford, in accordance with GIDSSA Paragraph 14(a).  (Countercl. ¶¶ 92.)  Auto states that Ford forced them to hire attorneys just so that Ford would meet with them, as provided for in Paragraph 14(a).  (*Id.* ¶ 94.)  After Auto's attorneys demanded a settlement meeting, Auto states that Ford begrudgingly agreed, but then failed to make even a "nominal offer" and "left the meetings stating it would not pay Auto 'a dime.'" (*Id.* ¶ 98.)

After the meetings, Auto states that the GIDSSA provided that any disputes relating to the contracts would be resolved through arbitration.  (Countercl. ¶ 99.)  Auto alleges that

10

Ford unilaterally chose unconscionable arbitration terms and then breached the terms when it preemptively filed a complaint in this Court.

On September 27, 2012, Ford filed a complaint seeking to enjoin arbitration proceedings.  (Dkt. 1.)

On November 15, 2012, Auto filed its answer with its counterclaims of breach of contract, breach of the Michigan Dealer Act, breach of fiduciary duty, unjust enrichment, and promissory estoppel. (Dkt. 5.)

On February 11, 2012, Ford moved to dismiss all the counterclaims except the breach of contract claims.  (Dkt. 22.)

On May 15, 2013, the Court issued its ruling, granting in part and denying in part Ford's motion.  The Court, as summarized above, allowed the equitable theories to proceed, given that the contract was not in front of the Court.  (Dkt. 24.)

## II.    Rule 56 summary judgment standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

11

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.  Analysis

Ford moves for summary judgment on Auto's breach of contract, promissory estoppel, and unjust enrichment claims.  Ford argues that Executive Order 13582 renders performance of the GIDSSA illegal, thereby permitting Ford to immediately terminate Auto's GIDSSA and discharges Ford from any duties under the GIDSSA.  Ford argues that the executive order also proscribes Auto's equitable theories of relief.

Auto opposes the motion.  Auto argues that Ford has improperly filed its motion before discovery has started.  Auto also argues that Ford has misapplied the law concerning Executive Order 13582's effect on the GIDSSA.  Auto finally argues that the case is replete with genuine issues of material fact about whether Ford acted opportunistically or in bad faith.

The Court agrees with Ford and its arguments.  The Court finds that Ford has appropriately filed this motion for summary judgment; this motion presents a purely legal argument, which the Court finds that it is able to rule on at this time.  The Court further finds that Ford has put forth an appropriate reason to terminate the GIDSSA; for Executive Order 13582 prohibits the type of performance the GIDSSA requires.  The Court also finds that the GIDSSA itself contemplates governmental regulations and orders such as the executive orders and gives Ford the option to terminate the GIDSSA.  While Auto makes much of the 2004 executive order and how Ford worked around that executive order to continue

12

performing the GIDSSA, Auto has not pointed to any provision in the GIDSSA that requires Ford to seek out a work-around or that a work-around or regulation were even possible after the 2011 executive order, which was a more encompassing embargo against Syria. Those arguments are not arguments for which Auto would need discovery. Auto has failed to show a material issue of fact so that the Court cannot rule on this motion at this time. The Court additionally finds that Auto cannot succeed on its equitable theories either, for recovery under those theories would contravene the 2011 executive order's policy and purpose.

### A. Contracts that violate executive orders are unlawful

A contract that violates an executive order or law is unlawful and discharges performance of the contract.[3]  Federal case law, Michigan case law, and secondary authority support this tenet.

*DMT S.A. v. Enercon Indus. Corp.*, 07-656, 2008 WL 1869031 (E.D.Wis. Apr. 24, 2008) is instructive and analogous.  *Enercon*'s facts mirror the facts in this case.  In *Enercon*, the plaintiff and the defendant entered into an agreement in which the defendant

---

[3]Both parties cite to Michigan law in their briefs.  But given that a federal executive order is at issue, federal law should apply.  *See DMT S.A. v. Enercon Indus. Corp.*, 07-656, 2008 WL 1869031 (E.D.Wis. Apr. 24, 2008).  The *Enercon* court pointed out that the parties had not addressed the issue of which law applies: federal or state.  2008 WL 1869031, at *4, n. 3. The court recognized that the Seventh Circuit had stated that "[w]hen the statute is federal, federal law determines not only whether the statute was violated but also, if so . . . the effect of the violation on the enforceability of the contract."  *Id.* (citations omitted.) And the court further quoted, "state law governs in general the rights and duties of sellers and purchasers of goods, . . . while the effect of illegality under a federal statute is a matter of federal law . . . even in diversity actions in the federal courts[.]"  *Id.* (citations omitted.) Here, the Court finds that federal and Michigan law mirror each other on the relevant issue–whether Executive Order 13582 renders the GIDSSA illegal and discharges the performance of it.

13

would supply certain equipment to the plaintiff for the plaintiff to deliver to China.  2008 WL 1869031, at *2.  After the parties executed the agreement the defendant learned that the plaintiff had delivered some of the equipment to Iran.  *Id.*  At the time of the delivery, an embargo was in effect against Iran.[4] The defendant informed the government about the unknowing delivery to Iran and then the defendant advised the plaintiff that it could not perform any services on the equipment that the plaintiff shipped to Iran.  *Id.*  Further discussions between the defendant and the government led the government to "instruct" the defendant to no longer do any direct business with the plaintiff.  *Id.* at *3.  The defendant then informed the plaintiff that it was no longer going to do any "direct business" with the plaintiff.  *Id.*

The plaintiff sued the defendant, asserting seven causes of action based on breach of contract.  *Enercon*, 2008 WL 1869031, at *3.  The defendant asserted a "straightforward" argument: that the plaintiff violated United States law by diverting the equipment to Iran and that further performance of the agreement would be unlawful–i.e. that the agreement was illegal and void.  *Id.*

The court reviewed the presidential executive orders concerning Iran.  *Enercon*, 2008 WL 1869031, at *3.  The court noted that the "Iranian trade embargo was intended to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States presented by the actions and policies of the Government of Iran."  *Id.* (internal quotation marks and citations omitted).  The court further noted that the executive orders were codified in regulations that "strictly" limited "the exportation,

---

[4]Exec. Order No. 12959, 60 Fed. Reg. 24757 (May 6, 1995).

reexportation, sale, or supply, directly or indirectly, from the United States, or by a United

States person, wherever located, of any goods, technology, or services to Iran or the

Government of Iran." *Id.* (citation omitted).  The court explained what those regulations

included:

> the exportation, reexportation, sale, or supply of any goods, technology, or
> services to a person in a third country undertaken with knowledge or reason
> to know that: (a) Such goods, technology, or services are intended
> specifically for supply, transshipment, or reexportation, directly or indirectly,
> to Iran or the Government of Iran; or (b) Such goods, technology, or services
> are intended specifically for use in the production of, for commingling with,
> or for incorporation into goods, technology, or services to be directly or
> indirectly supplied, transshipped or reexported exclusively or predominantly
> to Iran or the Government of Iran.

*Id.* at 3-4 (citation omitted).  The court then looked to the Fourth Circuit's recognition of how

broad the export restrictions were.  *Id.* at *4.  The court noted that the executive order

applied to the exportation or reexportation of "any goods, technology . . . or services," or

"any new investment . . . in Iran." *Id.* (citation omitted).  The court stated that "[t]he obvious

purpose of the order is to isolate Iran from trade with the Untied States." *Id.* (citation

omitted).

Given the executive orders and the regulations, the court found that the defendant

properly terminated the agreement, given that the moment the equipment arrived in Iran,

and given that the agreement called for continued services to the equipment after delivery,

the contract was illegal.  *Enercon*, 2008 WL 1869031, at *4.

The court also rejected the plaintiff's position that it could recover under one of its

equitable theories.  *Enercon*, 2008 WL 1869031, at *5.  The court noted that the plaintiff

had not pointed to any authority that supported the argument that an invalid or illegal

contract could still give rise to quasi-contractual recovery.  *Id.*

15

Ford has also pointed to a case that shows that criminal liability stems from violating an executive order. In *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 145 (2d Cir. 2004), the United States charged the defendant with violating a trade embargo against Iran by transferring money from the United States to Iran. There, the jury found that the defendant violated the trade embargo that President Clinton enacted on May 6, 1995, in Executive Order 12959, and with various federal regulations. *Id*. The embargo prohibited the exportation, directly or indirectly, from the United States, of any goods, technology, or services to Iran. *Id*. at 146 (citations omitted). The jury found that the defendant violated the embargo when he transferred money to Iranian bank accounts. *Id*. at 145-46. On appeal, the defendant argued that there was insufficient evidence to demonstrate that his money transfer was a "service" that the embargo prohibited. *Id*. at 146. The Second Circuit held that "the execution on behalf of others of money transfers from the United States to Iran is a 'service' under the terms of the Embargo." *Id*. The court reasoned that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee." *Id*. (citation omitted).[5]

Michigan law also supports the conclusion that when a law renders the performance of a contract illegal, that the performance of the contract is discharged. *See Hooper v. Mueller*, 123 N.W. 24 (Mich. 1909) (quoting, with approval, "the enactment of a law after a lawful contract is made which renders its performance unlawful discharges the contract." And also quoting, "[t]he authorities are almost unanimous in holding that, where the act

---

[5] *See United States v. Banki*, 685 F.2d 99, 107-08 (2d Cir. 2012) ("[T]he transfer of funds on behalf of another constitutes a 'service' even if not performed for a fee.") for further support of how encompassing "services" is.

16

contracted for is rendered unlawful by the enactment of a statute before the expiration of the time for performance, the obligation is thereby discharged[.]") (citations omitted).  *See also Szczubelek v. Department of Attorney Gen.*, 227722, 2002 WL 410365, at*1 (Mich.Ct.App. Mar. 15, 2002) (citing case law for the proposition that "where a contract is legal when made, a subsequent change in the law which makes performance illegal excuses that performance and extinguishes a right to recoup damages for the nonperformance of that unenforceable contract.") (citations omitted).

Even more support exists in secondary authority, the Restatement (Second) of Contracts.  Restatement (Second) of Contracts §§ 261 and 264 address a government regulation or order's effect on a contract.  Section 261 states that if "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."  Section 264 provides

> If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.

The rationale for the section shows that a governmental order's effect is to allow a party to discharge the performance of the contract.  The rationale continues, "[t]he fact that it is still possible for a party to perform if he is willing to break the law and risk the consequences does not bar him from claiming discharge."

The Court finds, therefore, that there is ample authority to support the holding that a governmental order or regulation that renders the performance of a contract illegal allows a party to discharge the contract without liability for breach of contract.

## B.  The 2011 executive order prohibited performance under the GIDSSA

Executive Order 13582 prohibited "the exportation, reexportation, sale, or supply, directly or indirectly, from the Untied States, or by a United States person, wherever located, of any services to Syria."  Exec. Order No. 13582, 76 Fed. Reg. 52209 (Aug. 17, 2011).  These executive orders, which the President has the power to enact pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-07, carry both civil and criminal penalties for violations of the orders.[6]

Performance of the GIDSSA conflicts with Executive Order 13582.  The GIDSSA requires monetary payment and reimbursement, shipment of goods, etc., directly and indirectly, of services to Syria.   As the *Enercon* court found, "any services" is a far-reaching bar to any interaction with the subject country.  In *Enercon*, the country was Iran; here, Executive Order 13582 prohibits any services flowing to Syria.

## C.  Ford lawfully terminated the GIDSSA

---

[6]50 U.S.C. § 1702 gives the President the power to regulate or prohibit any transaction in foreign exchange, any transfer of credit or payment involving a foreign country or national, etc.  Under 50 U.S.C. § 1705 (a),

> It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter [(International Emergency Economic Powers).]

Section 50 also provides for civil and criminal penalties against those who violate the section.  50 U.S.C. § 1705 (b) and (c).

Given that Ford's performance of the GIDSSA would violate the executive order, the executive order made the GIDSSA illegal, and Ford had the right to terminate it.  Ford points to two General Licenses that the United States Department of Treasury issued. These licenses affirm that Executive Order 13582 rendered the GIDSSA illegal and required Ford to terminate it.  General License No. 7, issued  September 9, 2011, gave parties to those contacts entered into before Executive Order 13582 until November 25, 2011 to wind down the contracts.[7]  As Ford suggests, this license contemplates terminating all contracts with Syria.   General License No. 9, also issued on September 9, 2011, permitted "individuals who are U.S. persons residing in Syria" to "pay their personal living expenses in Syria and to engage in other transactions, including with the Government of Syria," that Executive Order 13582 otherwise prohibited.[8]  General License No. 9 did not authorize "[t]ransactions or services ordinarily incident to operating or supporting a business in Syria, employment in Syria, or any new investment in Syria."   Again, this license supports the holding that after the 2011 executive order, performance of the GIDSSA was illegal, allowing Ford to terminate the GIDSSA immediately.

### D.  The GIDSSA contemplated governmental regulation and permitted Ford to terminate the agreement if it ran afoul of law

---

[7]Available at:
http://www.treasury.gov/resource-center/sanctions/Programs/Documents/syria_gl7.pdf

[8]Available at:
http://www.treasury.gov/resource-center/sanctions/Programs/Documents/syria_gl9.pdf

The GIDSSA itself lends further support to Ford's position, for it expressly allows Ford to terminate the agreement if a law prohibits performance of the GIDSSA.  The severability paragraph states:

> If any provision of this Agreement is invalid, unenforceable or prohibited by law, the Company may elect either to terminate this agreement in its entirety or consider this Agreement divisible. . . [sic] and such provision shall be inoperative and the remainder of this Agreement shall be valid and binding and of like effect as though such provision were not included herein.

(GIDSSA Standard Provisions ¶ 26.)  As this paragraph states, Ford has the discretion to terminate the GIDSSA if a law renders performance of the GIDSSA illegal.  Here, Ford exercised that discretion; Auto has not made any argument to the contrary.

Auto points to the GIDSSA's amendment paragraph:

> [n]otwithstanding anything in this Agreement to the contrary, the Company shall have the right to amend, modify or change this Agreement in case of legislation, government regulation or changes in circumstances beyond the control of the Company that might affect materially the relationship between the Company and the Dealer.

(GIDSSA Standard Provisions ¶ 24.)  Auto argues that this paragraph requires Ford to seek a way around the 2011 executive order.  The Court does not agree.  Here, again, as in Paragraph 26, the GIDSSA gives Ford the discretion to take certain actions if a law contravenes the GIDSSA.  This paragraph does not impose a duty upon Ford.  Ford therefore had an express right under the GIDSSA to terminate it.

### E.  Auto has not brought forth any argument that persuades the Court that Ford could have or should have sought a means around the executive order

Auto makes much of the fact that Ford has filed its motion for summary judgment before discovery has commenced.  (Auto's Resp. at 12.)  Auto argues that it needs discovery to show how the parties' prior course of dealings, course of performance, and

20

trade usage would reveal that Ford acted opportunistically and in bad faith in terminating the GIDSSA.  (*Id.*)

Auto states that it had the reasonable expectation, given the 2004 executive order, "that Ford would make a good faith attempt to continue in business with Auto; at the very least Ford would attempt to mitigate losses to Auto, including making Auto whole for its reliance investments."  (Auto's Resp. at 15.)  Auto argues that "Ford has presented no evidence that the U.S. government did not provide options to Ford that could have allowed the parties to continue to perform under the contract (as Auto had come to expect after the 2004 [executive order]).  Auto additionally argues that Ford had the discretion to use the GIDSSA to shield itself from liability and that Ford had the discretion to seek a license from the U.S. Departments of Treasury and Commerce to allow it to continue performance or to wind down business. (*Id.* at 15.)

Ford points out, though, that the GIDSSA puts no obligation on Ford to ask the government to allow Ford an exception.  (Ford's Reply at 4, n. 2.)  Ford properly notes that 15 C.F.R. § 746.9(c)(1) is a general prohibition to the approval of license applications: "all license applications for export or reexport to Syria are subject to a general policy of denial." (*Id.*)

And Ford finally points out "if any American company had received a license to continue a dealership relationship in Syria, it would be public knowledge that [Auto] could easily bring to this Court's attention." (Ford's Reply at 4, n. 2.)

Auto has not persuaded the Court that this motion is not ripe for adjudication.  Auto argues that it needs discovery to show that Ford acted in bad faith in terminating the GIDSSA.  But, as Ford has pointed out, there are express provision in the GIDSSA that

21

permit Ford to terminate the GIDSSA.  The bad faith argument therefore lacks merit. *See*

*Eastway & Belvins Agency v. Citizens Ins. Co. of Am.*, 520 N.W.2d 640, 642 (Mich.Ct.App.

1994) ("Where . . . a party's discretion to terminate is limited, good faith need only have

existed at the time the original agreement was made." "A lack of good faith cannot override

an express provision of a contract." "In contract termination cases, good faith is required

only where the terminating party has unbridled discretion with respect to the other party's

performance under the contract.") (citations omitted).

Auto faces other problems, too.  If, for example, Ford had acted in bad faith in

terminating the GIDSSA, the 2011 executive order still would make the performance of the

GIDSSA unlawful, despite any actions Ford may have taken.  Auto cannot get around the

2011 executive order.  The order, and the policy issues surrounding the order, are bigger

than the GIDSSA.  The Court cannot permit  Auto recovery under any theory when the

policy against economic interactions with Syria is so strong.[9]

---

[9]Secondary authority guides the Court in its determination that public policy requires the Court to find that Executive Order 13582 requires nonperformance of the GIDSSA and allows Ford to terminate the agreement. *See* Restatement (Second) of Contracts § 178(1): (1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms. (2) In weighing the interest in the enforcement of a term, account is taken of (a) the parties' justified expectations, (b) any forfeiture that would result if enforcement were denied, and (c) any special public interest in the enforcement of the particular term. (3) In weighing a public policy against enforcement of a term, account is taken of (a) the strength of that policy as manifested by legislation or judicial decisions, (b) the likelihood that a refusal to enforce the term will further that policy, (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and (d) the directness of the connection between that misconduct and the term. Weighing these factors, the Court finds that Executive Order 13582 is clear–it's goal is to cut off Syria from the economic benefits that a United States person may provide.  Applied

22

As the Court has stated, this motion presents a purely legal issue. Auto argues that Ford could have sought a license to exempt itself from the 2011 executive order. But Auto has not shown how Ford could have done so, nor pointed to any regulation that would permit Ford to do so. And, as Ford points out, Auto also argues that it needs discovery on trade usage to see how other companies dealt with the 2011 executive order. The Court fails to see how Ford would know about that unrelated discovery. If Auto thought there was a situation 'out there' that would help its case, it should have gone out and found it. The information would not be related to this case, it would, as Ford states, be public knowledge.

The Court therefore finds that Auto has failed to show that there is a legal or factual dispute for which summary judgment is not appropriate. Ford has pointed to reasons, legitimate reasons founded in policy, the GIDSSA, and contract law, for its termination. Auto has not countered with any availing reason that Ford could not discharge the GIDSSA.

### F. The 2011 executive order also prohibits recovery under equitable theories

As one of the 2011 executive order's aims was to prohibit the flow of money to Syria, the Court finds that Auto cannot recover under an equitable theory.

General contract law supports this holding. *See* 8 Williston on Contracts § 19:77 (4th ed. 2010) ("It is the general rule that when a contract is either partially or wholly illegal, not even a quasi-contractual recovery is available.).[10] *See also Szczubelek*, 2002 WL 410365,

_____

here, the executive order prohibits recovery under a breach of contract theory as well as any equitable theory.

[10]See Restatement (Second) of Contracts §§ 197-99. 197 Restitution Generally Unavailable:

Except as stated in §§ 198 and 199, a party has no claim in restitution for

at *2 ("Generally speaking, estoppel cannot be used to enforce an illegal contract or allow its rescission if the contract offends public policy embodied in a statute.") (citation omitted).

"The only exception to this rule regards situations where other policy considerations are present, and warrant an application of promissory estoppel." *Szczubelek*, 2002 WL 410365, at *2 (citations omitted). Here, no policy considerations weigh in favor of restitution, the considerations, conversely, weigh heavily against restitution. As stated above, the 2011 executive order's purpose is to cut off ties with Syria, including economic ties and the flow of services and specifically money to Syria. Given that purpose, if the Court were to find that Auto could recover under an equitable theory, the Court would be permitting Auto to defeat the 2011 executive order's purpose. *Szczubelek*, 2002 WL 410365, at *1 (recognizing that there are circumstances in which restitution would be appropriate, but not in situations where, if a court ordered restitution for the plaintiff, the defendant would be retroactively violating the statute of law that rendered the contract illegal in the first place. And summarizing, "[t]he taint of illegality that would exist in allowing [the] plaintiff to sue for legal damages based on breach of contract would not be avoided by allowing [the] plaintiff to recover restitution for unjust enrichment.").[11]

---

performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy unless denial of restitution would cause disproportionate forfeiture.

Here, neither of the two exceptions applies.

[11]The *Szczubelek* court reasoned that, when "considering whether to permit an exception to the general rule that an illegal contract cannot be enforced, a court 'should carefully scrutinize the particular statute under advisement, for the purpose of ascertaining, from the subject matter and language used, the object for which it was enacted and the intent of its makers, to the end that such intent may be rendered effectual and the indicated purpose accomplished." 2002 WL 410365, at *1 (citation omitted).

24

Auto argues that, if the Court finds that Ford properly terminated the GIDSSA, that Auto is entitled to recover under an unjust enrichment or promissory estoppel theory. (Auto's Resp. at 21.)  Auto cites cases that support the proposition that equitable recovery is available when a contract is rendered impractical or impossible.  (*Id.* at 22-24.)  Auto also argues that Ford misread's *Szczubelek* to argue that anytime a statute renders a contract illegal that equitable recovery is not available.  (*Id.* at 24.)

At the hearing, Auto set forth an example that it suggests should persuade the Court to find that equity requires Ford to compensate Auto.  Auto explained that, when it purchased the Ford vehicles, included in the price was the cost of performing warranty maintenance.  When the 2011 executive order voided the GIDSSA and customers eventually came to Auto to have it perform warranty maintenance, Auto stated that it could not seek reimbursement for the warranty service.  So Auto stated that the customers no longer paid for their cars, because they knew that the cars would not have the warranty performed on them.  Auto stated that restitution required Ford pay back the amount of the warranty and the reimbursements, as equity required.

The Court disagrees with Auto's position.  While Auto may point to cases that support its position, Auto has not presented any argument as to how, in this situation, permitting an equitable recovery would not contravene the 2011 order.  Ford points out this position: "[Auto], however, does not even attempt to suggest a reason why 'restitution' payments to a Syrian corporation would be any less offensive to the public policy of [Executive Order] 13582[.]" (Ford's Reply at 5.)   Every cost of the GIDSSA and investment made pursuant to the LOU was part of a contract.  The executive order renders the GIDSSA illegal,

25

therefore Ford cannot perform it and the Court cannot order any relief, such as equitable

relief, that only stems from the contract and the parties contemplated in the contract.

## IV.    Conclusion

Because Executive Order 13582 renders the GIDSSA illegal, Ford properly terminated

the agreement and Auto cannot recover under a breach of contract or equitable relief

theory, the Court GRANTS Ford's motion for summary judgment.

So ordered.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 7, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record
on November 7, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer